### BEULAH COAL MINING CO. v. VERBRUGH.

(Circuit Court of Appeals, Eighth Circuit. August 1, 1923.)

No. 6198.

1. **Master and servant ⊛236(18)—Injured servant in mine held chargeable with contributory negligence.**

Plaintiff, employed in laying track in a coal mine, where he had worked for some time, in going from one part of the mine to another, passed through the hoist shaft, and was struck by the descending hoist and injured. But a few inches to one side of the shaft a safe passageway was provided, of which he knew. *Held*, that he was chargeable with contributory negligence, which barred recovery for his injury.

2. **Master and servant ⊛236(1)—Use by employé of dangerous rather than safe way is negligence.**

Where there is a comparatively safe way, as well as a dangerous way, known to an employee, by means of which he may discharge his duty, it is a want of ordinary care for him to select and use the more dangerous way.

3. **Master and servant ⊛139—Failure to give warning not proximate cause of injury.**

Where plaintiff, while passing through the hoist shaft in a coal mine, was struck and injured by the descending hoist, but when the hoist was started down he was too far away to hear the signal then customarily given, whether or not such signal was given is immaterial in an action for the injury.

4. **Master and servant ⊛101, 102(1)—Master's duty to provide reasonably safe place to work is that of ordinary care.**

The duty of the master to provide for the servant a reasonably safe place to work is that of ordinary care, to observe such degree of care, and to take such precautions, and to install such devices as are usually and customarily observed, taken, and installed by ordinarily prudent and cautious persons engaged in similar business.

In Error to the District Court of the United States for the District of North Dakota, Andrew Miller, Judge.

Action at law by Jacob J. Verbrugh against the Beulah Coal Mining Company. Judgment for plaintiff, and defendant brings error. Reversed.

⊛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

E. T. Conmy, of Fargo, N. D. (Young, Conmy & Young, of Fargo, N. D., on the brief), for plaintiff in error.

George A. Bangs, of Grand Forks, N. D., for defendant in error.

Before SANBORN, Circuit Judge, and BOOTH and FARIS, District Judges.

FARIS, District Judge. Defendant in error, who was plaintiff below, had judgment for damages for personal injuries caused by the alleged negligence of plaintiff in error, which judgment the latter here seeks to reverse. We shall refer to the parties as they stood below, and for brevity designate them as plaintiff and defendant.

Plaintiff, while employed as a tracklayer in a coal mine operated by defendant, was seriously injured. The negligence relied on for recovery is the alleged failure of defendant to furnish plaintiff a safe place to work, and the failure to give proper signals of the lowering of a cage in a hoist used in defendant's mine. The defenses below were: (a) Contributory negligence of plaintiff; (b) that plaintiff was injured by the negligence of a fellow servant; and (c) the assumption by plaintiff of the latter risk, as well as the risk of the situation.

[1] Numerous contentions of error are urged. These, for the major part, have reference to the admission of incompetent testimony, the refusal of competent testimony, and to the giving and refusal of charges by the judge to the jury. Upon a wholly casual view, many of these contentions seem well taken; but, for a reason adverted to below, we have been constrained to conclude that we need not discuss any of the numerous errors assigned, save and except error bottomed upon the refusal of the trial court to direct a verdict for defendant, which defendant requested the court to do, both at the close of the evidence for plaintiff and at the close of all the evidence in the case. This view renders necessary a brief statement of the facts, which run thus:

Plaintiff, a man of mature years, had had experience in many fields of labor and occupation. Before he was injured, he had been working in the mine of defendant for 41 days, and necessarily had become familiar with its condition and the situation of all its adjuncts. The depth of the shaft, to the level whereat plaintiff's hurt happened, was only some 57 feet, which includes some 15 feet above the surface of the earth to the floor of the tipple house superstructure. There were windows in the tipple house, through which light, in some degree, at least, penetrated to the bottom of the working level or drift.

This shaft was a double shaft, with two divisions or compartments. On one side of this double shaft there was a stairway, leading down from the tipple house to the bottom of the drift or working level. This stairway was used by the miners, tracklayers, and other underground employees, in going down into the mine to work and in returning therefrom. The stairway shaft, as well as the hoist shaft, was floored. There was a sump under this floor to catch seep water. On both the north and the south sides of this stair shaft there was an opening called a manway, through which the employees, including plaintiff, passed in going to and from the stairway into the mine to work, or in returning therefrom. These manway openings were from 20 inches to 27 inches

wide by actual measurement and about 5 feet high, and led respectively into the north and south levels from the bottom of the stairway, and at a point distant only some 10 inches from the hoist shaft.

The other half of the shaft was occupied by the hoist, which consisted essentially of a cage, made to ascend and descend in the shaft, by winding or unwinding a rope upon a horizontal capstan, or windlass operated by steam power. When at the bottom of the shaft, this cage rested in a depression some 8 to 14 inches below the general bottom of the mine floor, or level; so that cars loaded with coal could be run directly from tramroad rails on the cage, and thus be brought to the surface. Loaded cars coming from the north (whence the coal was being taken when plaintiff was hurt) were run upon this cage from the rails of the tramroad. Unloaded cars coming down were run to the south, likewise upon a connecting tramroad, and were there shunted around the shaft, through a drift east thereof containing a tramroad, back to a point north of the shaft, to be again loaded.

At the bottom of the shaft there was employed a man called a "cager," whose duty it was to push loaded cars on the cage and to push off unloaded ones. When the cage was loaded and ready to go up, the cager called up the shaft to the hoist operator, "Coming up," and the latter called "Coming down," when the cage was descending.

There was an electric light placed about 9 feet from the bottom of the shaft on the north level. The plaintiff, at the time he was hurt, had a light on his hat. He was hurt while he was endeavoring to pass from the north side of the hoist shaft to the south side thereof, where he desired to get certain ties which had been placed there, for use in his work of tracklaying. Instead of using the manway, he chose to pass through the hoist shaft. The cage came down; he was struck by it and seriously hurt. His own version of what occurred runs thus:

"We were ready to put in the ties, and I looked around for them and did not see them, and I walked out of the west entry and saw the ties standing by the wall of coal, about 75 feet away. I looked straight toward the ties, and I heard somebody holler, 'Duck your head,' and there was the cage about a foot above my head. I had a light on my hat big enough so I could find the hole to get into the stairway shaft. When we come up to the shaft, we don't look for it. If I had looked, I could probably have seen it, I suppose."

Being questioned further as to his actions as he approached the ties, which were on the south side of the hoist shaft as he came toward them from the north side thereof, he made these answers:

"Q. I say, where were you looking? A. I was looking toward the ties.

"Q. And did you keep looking toward the ties all the time? A. Yes, sir; looking toward the ties.

"Q. You didn't make any effort to look around? A. No; looking at the ties.

"Q. You didn't make any effort to look around, to see whether you were going toward the cage or not? A. I didn't know the cage was there.

"Q. You didn't make any effort to find out whether it was there or not? A. I didn't know the cage was there.

"Q. I say, when you came along there, you kept constantly looking at the ties, as you went towards them to get them; that is right, is it? A. Yes.

"Q. And you didn't swing the light on your cap around to see whether you were coming near the hoistway or not, where the cage came down; you didn't look around to see that, did you? A. No.

"Q. You didn't notice, as you came along the entryway into the stairway shaft, did you? A. I looked straight ahead towards where the ties were.

"Q. If you had switched your light, turned your head a fraction of an inch, you could have seen that entry as you came along, couldn't you? A. I didn't see it.

"Q. I say, if you had switched your head a little bit to the left there, as you were coming south, you could have seen that entryway into the stairway shaft? A. Yes; I could have seen it.

"Q. And you could have seen the timbered wall there between the two shafts, if you had switched your light a little, couldn't you? A. I probably could; I don't know."

[2] From this excerpt it is too plain for argument that plaintiff was guilty of contributory negligence. Instead of passing through the manway, which was less than a foot away, and which he knew was there, for he had used it four times a day for 41 days in going to and returning from his work, he chose, without looking where he was going, to walk through the shaft and under the descending cage. His act was not due to darkness, for he admits he could see the ties beyond and across the shaft opening and 75 feet away. His excuse is he did not know the cage was there. But he had himself for some 3 hours worked as a cager on this cage, and had been around and near it for 41 days. And he does not deny that he knew the shaft was there, and that the cage was in the shaft. It is well settled that, where there is a comparatively safe way, as well as a dangerous way, known to an employee, by means of which he may discharge his duty, it is a want of ordinary care for him to select and use the more dangerous way. Williams Cooperage Co. v. Headrick, 159 Fed. 680, 86 C. C. A. 548, and cases cited.

[3] Upon the contention that a signal ought to have been given, the proof is that the custom was to give notice of the lowering of the cage by calling down the shaft, "Coming down." Defendant's testimony is that a signal was given on this occasion. Plaintiff denies this, but this situation cannot avail him. If a signal was not given, since it was the custom to give it, the failure to give it was the negligence of a fellow servant. Indeed, the situation, facts, and circumstances clearly show that the failure to give a signal cuts no particular figure in the case; for it took about one minute to lower this cage. Therefore, when the signal should have been given, plaintiff was away from the shaft at a distance therefrom equal to the distance he was able to walk in a minute. At the rate of 2½ miles per hour, a man walks 220 feet in a minute. So, whatever else may be said of the situation, the failure to give a signal of the lowering of the car was not the proximate cause of the plaintiff's hurt. He might well have been, and he must have been, out of hearing of this signal when it was given.

[4] Upon the views already expressed, no occasion arises for discussing whether plaintiff assumed the risk of the situation. The duty enjoined upon the master is that of observing ordinary care to provide for the servant a reasonably safe place to work. The master is not compelled to observe every degree of care, and to install every possible device, and to use every precaution which engineers and astute counsel may be able to imagine or conjure up, after the fact of a casualty, and in order to subserve the necessities of a lawsuit. His duty is to ob-

serve such degree of care, and to take such precaution, and to install such devices, as are usually and customarily observed, taken and installed by ordinarily prudent and cautious persons engaged in a similar business. Williams Cooperage Co. v. Headrick, 159 Fed. 680, 86 C. C. A. 548. Even if there was a showing in the record of a failure to observe this degree of care, and this is doubtful, plaintiff could, by assuming the risk of defendant's negligence, have waived it, if he had knowledge of it, actual or imputed.

But in view of the conclusion, which is inevitable, even if regrettable, that plaintiff was upon the record guilty of the grossest contributory negligence, no occasion arises to pursue the subject of assumption of risk, further than the merely general observations set out above.

It follows that the court erred in refusing to direct a verdict for defendant, and the case ought to be reversed and remanded, with instructions to the trial court to grant a new trial; and so accordingly it is ordered.