**HARRISON v. L. E. MYERS CONST. CO. et al.**

No. 8723.

Circuit Court of Appeals, Eighth Circuit.

July 18, 1930.

Hugh Carney, of Atlanta, Tex. (Howard A. Carney, of Atlanta, Tex., on the brief), for appellant.

James D. Head, of Texarkana, Tex. (King, Mahaffey & Wheeler, of Texarkana, Tex., and Arnold & Arnold, of Houston, Tex., on the brief), for appellees.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

GARDNER, Circuit Judge.

Appellant, plaintiff below, received personal injuries while in the employ of the de-

fendant L. E. Myers Construction Company, and brought this action against that company and the defendant Southwestern Gas & Electric Company to recover damages for such injuries. The gist of the allegations with reference to the alleged negligence of the defendant Myers Construction Company was that it had failed to exercise proper care to furnish the plaintiff with a reasonably safe place in which to work, and that it had failed to post notices of the dangerous condition of the premises, and had failed to maintain sufficient lights in that portion of the premises where plaintiff received his injuries.

The Myers Construction Company, with certain admissions as to the employment of the plaintiff, denied all allegations of negligence contained in the complaint and alleged that the plaintiff at the time of receiving his injuries had departed from the line of his duties for some purpose of his own; that he knew, or by the exercise of ordinary care should have known, the danger of using the portion of the premises in the use of which he was injured; and that his injury was due solely to his own negligence. In the view we take of the case, it will not be necessary to consider the relation of the defendant Southwestern Gas & Electric Company, the owner of the premises, nor the issues raised by its separate answer.

It appears from the evidence that plaintiff, at the time of receiving his injuries, was employed by the defendant Myers Construction Company as a painter. He was thirty-five years of age and had been a painter engaged in various kinds of painting for over twenty years. He was first employed on the building where he received his injuries, July 23, 1928. Some two weeks prior to the accident, he, with certain other painters, painted the outside of a structure referred to in the record as a flume. This was constructed of sheet metal and was superimposed upon the roof of the boiler room. It had a rounded top and its general exterior appearance resembled somewhat a railway baggage or express coach. It extended in an easterly and westerly direction and varied in height, growing gradually higher from the east toward the west. At its west end this flume connected with a smokestack. The total length of the flume was one hundred twenty-four feet, and it extended out over the west end of the roof so as to connect with the smokestack, and at the east end it extended over the roof. This structure was covered on the interior with stucco and had been finished complete some two weeks prior to the time

plaintiff received his injuries. Through the south wall or side of this flume were two openings which in normal condition were closed with metal sheets bolted to the metal wall or side of the flume, through which, when opened, ingress and egress might be had to the interior of the flume. These openings or manholes, apparently two in number, were twenty-one inches in width by thirty inches in height; the bottom of the opening being about a foot above the roof of the building. This roof was made of cement and gravel, had a smooth surface with a slope of about one-fourth of an inch to every five feet, and extended the whole length of the boiler room. Entering the bottom or floor of this flume, through the roof, came from the boiler room below, five uptakes from the battery of seven boilers. Where these uptakes entered through the bottom or floor of the flume, there were openings, as the purpose of the uptake was to carry off smoke and gas from the boilers below the flume, the smoke passing thence from the flume to the smokestack. After the flume had been finished on the inside, the plaintiff and other painters painted it on the outside, but no paint was ever applied to the inside, and no painter had any duty requiring him to enter the flume. After the flume had been completed both inside and out and the boilers had been fired up, an explosion occurred, damaging the stucco lining in the interior of the flume near its west end, at a point near what is described as the uptake from boiler number seven, and the heat from the boiler damaged or destroyed the painting on the outside at that place. It also destroyed the lining in that part of the flume, so that the boilers were shut down to permit the flume to cool off so that workmen might repair it. To make these repairs on the interior it was necessary that the workmen have ingress and egress to the inside of the flume, and this could only be had through the openings which, as before noted, in normal condition were closed by metal plates. At the time of the accident these metal plates had been removed so as to permit ingress and egress, and also to permit circulation of air as the weather at that time was hot.

On the morning of October 8, 1929, while these interior repairs were in progress near the uptake at the west end of the flume, the uptake at that point was covered over with metal and boards, on top of which was placed a tarpaulin. The other uptakes, however, were all open, as no repairs were being made near them. At this time the painting crew, including the plaintiff, were engaged in re-

painting the outside of this flume near the west end of the south side where the paint had been destroyed by the explosion. At about fifteen minutes before 12 m., plaintiff was called from his work to the east end of the flume, and as he passed the north opening, he placed his paint bucket inside and says that he then observed that workmen were at work repairing the interior at a point west from that opening. There were electric lights temporarily installed in the portion of the interior of the flume where the workmen were employed, and plaintiff observed that the uptake at number seven was covered. He then passed east on the roof outside of the flume to the edge of the roof on the east side of the building. Shortly thereafter he had occasion to return to his place of work. There was, as has already been noted, another opening near the east end of this flume, identical with that described as near the west end, and in returning to his work he passed into this opening and attempted to walk west on the inside of the flume, and in doing so stepped into one of the open uptakes and was seriously injured. There was no light in that part of the flume, except such as came from the small opening through which plaintiff entered and such as may have come from the temporarily installed lights where the workmen were making repairs near the west end of the flume.

Plaintiff knew all about the construction of the building, and likewise knew that in their normal condition these uptakes were of necessity open, but he says he thought they would be covered up because he observed that the opening at uptake No. 7, near which the workmen were making repairs on the interior of the flume, was covered. The uptake into which he fell was some five or six feet west from the opening or manhole through which he entered, and the outer edge of the uptake came within about six inches of the south wall of the flume. He had never passed through the interior of the flume in this manner before, nor had the other workmen, and he says he undertook to pass through in this way because he thought it might be cooler. He was, of course, perfectly familiar with the condition of the roof on which he was working and its immediate surroundings, and there was nothing to obstruct his free passage over the roof to and from the place where he was engaged at work. He had, in fact, just passed over this roof in going to the east end of the flume. He had not looked to see whether or not the uptakes, other than the one near where the

men were working, were covered, but says that he presumed they were covered. He says that he did not look to see because he could not tell exactly where they were on account of it being dark, but that he knew of these uptakes, and without looking he went in and stepped off into the open uptake.

Under this state of the evidence, the court, on motion of the defendants, directed a verdict in their favor, and this ruling of the court is the basis of this appeal. It goes without saying that it was the duty of the employer, the Myers Construction Company, to exercise ordinary care to furnish the plaintiff with a reasonably safe place in which to work, and the first question to be determined is whether or not there was any substantial evidence to show that it failed to exercise such care. This depends in some degree upon the maturity, intelligence, and discretion of the employee. Where the employee is youthful and inexperienced, or without knowledge or means of knowledge of the condition of the premises, greater care or caution is required than where the employee is of full age, of ordinary intelligence, and acquainted with the condition of the premises. It appears from the undisputed evidence that the plaintiff knew of the nature of the construction of the interior of this flume; he had no duty taking him inside; and the openings in the flume were not invitations to him to enter where he had no duty to perform. The interior of this flume was not the place where plaintiff was required to work, nor was the interior of the flume a means of ingress or egress, or a way customarily used by the plaintiff in passing from one part of the premises on which he was engaged to another in the course of his employment. The proof shows that it was not even occasionally so used. He unnecessarily took this dangerous route instead of the safe one which the defendant had furnished him. This act of negligence on his part was the proximate cause of his injury. Morris v. Ry. Co. (C. C. A.) 108 F. 747; Dawson v. Ry. Co. (C. C. A.) 114 F. 870; American Linseed Co. v. Heins (C. C. A.) 141 F. 45; St. Louis, etc., R. Co. v. Conway (C. C. A.) 156 F. 234; H. D. Williams Cooperage Co. v. Headrick (C. C. A.) 159 F. 680; Johns-Manville v. Pocker (C. C. A.) 26 F.(2d) 204; Beulah Coal Mining Co. v. Verbrugh (C. C. A.) 292 F. 34; Atlantic, etc., R. Co. v. Davis, 279 U. S. 34, 49 S. Ct. 210, 211, 73 L. Ed. 601. No one is required to guard against or take measures to avert that which a reasonable person, under the circumstances, would not anticipate

as likely to happen, and it is not negligence to have failed to anticipate negligence on the part of some other intelligent and experienced person. Generally speaking, the employer's duty to furnish his employees with a safe place in which to work extends to such parts of his premises only as he has prepared for their occupancy while doing their work and to such parts as the employer knows, or ought to have known, they were accustomed to using while doing their work. The plaintiff had been furnished a perfectly safe place in which to work and a safe way for passage to and from his place of work, but he voluntarily left the way known by him to be safe and took his chances in attempting to pass through this dark passageway. He did so to serve no purpose of his employer, but either out of idle curiosity or as a means of cooling off. What is said by the Supreme Court of the United States in Atlantic, etc., R. R. Co. v. Davis, supra, is peculiarly apposite here. It is there said:

"The inevitable conclusion from all the evidence is that he [appellant] voluntarily abandoned the safe position on the running board which he at first assumed and placed himself in a position of extreme danger on the 'jack-arm,' a place not furnished for the performance of this work and ill adapted thereto, and one of obvious danger in which he would inevitably be struck if the boom made a full swing unless he moved out of its path; and thereby through his own negligence, as the sole and direct cause of the accident, brought on his own death."

Under the evidence, all reasonable men must have reached the conclusion that the plaintiff's injury was not due to any negligence of the defendant, but was due to his own negligence. Under such circumstances, it was the duty of the lower court to direct a verdict in favor of the defendants. Small Co. v. Lamborn & Co., 267 U. S. 248, 45 S. Ct. 300, 69 L. Ed. 597; Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720; Phoenix Mutual Life Ins. Co. v. Doster, 106 U. S. 30, 1 S. Ct. 18, 27 L. Ed. 65; Montclair v. Dana, 107 U. S. 162, 2 S. Ct. 403, 27 L. Ed. 436; B. & O. R. R. Co. v. Groeger, 266 U. S. 521, 45 S. Ct. 169, 69 L. Ed. 419; C., M. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 46 S. Ct. 564, 70 L. Ed. 1041; St. L.-S. F. R. R. Co. v. Mills, 271 U. S. 344, 46 S. Ct. 520, 70 L. Ed. 979.

We have dealt particularly with the question of the liability of the defendant Myers Construction Company. Having reached the conclusion that the plaintiff's injuries resulted directly from his own negligence, it follows, not only that there was no liability on behalf of the defendant Myers Construction Company, but no liability on behalf of the defendant Southwestern Gas & Electric Company.

The judgment of the lower court should be, and is, affirmed.